**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:10-cr-00254** |
| | ) | **Judge Trauger** |
| **GERARDO RUIZ and** | ) | |
| **LUIS ALBERTO RUIZ** | ) | |

**MEMORANDUM**

Pending before the court are the Motions to Suppress filed by defendant Luis Alberto
Ruiz (Docket No. 43) and defendant Gerardo Ruiz (Docket No. 54), to which the government
has filed responses (Docket Nos. 52 and 66).  On March 18, 2011 and April 14, 2011, the court
held an evidentiary hearing regarding the motions, after which the parties filed post-hearing
memoranda (Docket Nos. 97, 98, 101, 110, and 111).  The government then filed a Motion to
Strike (Docket No. 113), to which the defendants have filed responses (Docket Nos. 114, 115).
For the reasons discussed below, the court will grant the defendants' motions and deny the
government's motion.

**FACTS**[1]

On September 14, 2010, defendant Luis Alberto Ruiz ("Luis") was driving south on
Interstate 65 with his cousin, defendant Gerardo Ruiz ("Gerardo"),[2] in the passenger seat.  In
Robertson County, Tennessee, they were pulled over for speeding by Lieutenant Shane

---

[1] The facts are drawn from the testimony and exhibits presented at the evidentiary
hearing.  Citations to the transcripts of the March 18, 2011 and April 14, 2011 proceedings are
given as "(Tr. __)" and "(Tr. II __)," respectively.

[2] For ease of reference, and not out of disrespect, the court will refer to the two
defendants, who have the same last name, by their first names.

Daugherty and Special Agent Travis Childers of the 17th Judicial District Drug and Violent Crime Task Force. During the stop, Daugherty received consent from Luis to search the car, and he discovered over one-half kilogram of heroin.

Both defendants have filed Motions to Suppress, pursuant to the Fourth and Fourteenth Amendments, seeking to suppress evidence of the heroin and any subsequent incriminating statements. The defendants primarily argue that the police lacked probable cause to make the initial traffic stop for speeding.

## I. The Alleged Speeding Violation and the Subsequent Pursuit

On the afternoon of September 14, Lt. Daugherty's patrol car was parked perpendicular to the median wall on I-65.[3] Agent Childers, Daugherty's partner for the day, was in the passenger seat. Although Childers does not typically ride on patrols, he was serving as a backup officer that day. (Tr. 156.)

At the evidentiary hearing, Daugherty testified that, as the black sedan driven by Luis (the "the Ruiz vehicle") approached, he visually estimated that it was traveling at 80 mph in a 70-mph zone. (Tr. 22, 117.) Daugherty stated that he then used his patrol car's radar unit to confirm that the vehicle's speed was 79 mph.[4] (Tr. 22.) He further stated that, as the sedan

---

[3] The patrol vehicle was actually a Chevrolet Tahoe, a sport utility vehicle. For simplicity, the court will refer to it as the "patrol car."

[4] Daugherty testified that there are three parts to the radar process: "You visually estimate the speed [of the target car]. You compare it to the tone once it's in that radar range. And if both of those match, then you lock the radar. That is a true speed." (Tr. 103.) This is necessary because the officer cannot simply point the radar at a specific vehicle; instead, the device "just sends . . . waves out in a cone shape, and whatever comes through[,] that is what is picked up." (Tr. 103.) When an officer locks a speed, the radar unit will display the locked speed in the center of the patrol car's dashboard. (Tr. 105.) The unit will continue displaying

passed, he could see that the driver's arms were stiffly locked at a 10-and-2 position on the steering wheel, which he considered unusual. (Tr. 90-91.) After the Ruiz vehicle passed, Daugherty pulled out and began pursuit.

The day after the traffic stop, Daugherty drafted a summary report (the "Report") at the request of another officer who was drafting a federal criminal complaint against the defendants. (Tr. 68, 70; *see also* Pl.'s Ex. 21 (the Report).) The two-page, typed report stated, in relevant part:

> I was sitting stationary at the 119-mile marker on I-65 in Robertson County monitoring southbound traffic when I observed a black vehicle traveling the left lane that appeared to be speeding. I turned on my radar and locked the vehicle traveling 79 mph in a 70 mph zone. As the vehicle passed, I noticed there were two males in the Ford 500. The driver did not look over at me as he passed, his hands were positioned at 10 and 2 on the steering wheel and his elbows were straight.
>
> When it was safe I pulled out into the flow of traffic and attempted to catch the vehicle. When I caught up to the Ford it was still in the left lane and had put a considerable amount of distance between it and the cars it was originally traveling near. I initiated my emergency equipment and the vehicle pulled over the shoulder [sic] of the interstate at the 113-mile marker.

(Pl.'s Ex. 21 at 1 (paragraph break added).)

The day after that, September 16, 2010, Daugherty prepared a case narrative (the "Narrative") by copying the Report and adding several details. (Tr. 73; *see* Pl.'s Ex. 22 (the Narrative).) Specifically, the Narrative stated:

> When I caught up to the Ford it was still in the left lane and had

_____

the locked speed for a significant period of time. (Tr. 106.)

put a considerable amount of distance between it and the cars it was originally traveling near. *I pulled beside the vehicle and paced the vehicle at 77 mph in a 70 mph zone for approximately 10 seconds.* I pulled behind the Ford 500 and initiated my emergency equipment. The vehicle pulled over the shoulder [sic] of the interstate at the 118-mile marker.

(Pl.'s Ex. 22 at 1 (emphasis added).)

The dashboard camera in the patrol car recorded part of the pursuit of the Ruiz vehicle, as well as the entirety of the subsequent stop.[5] As the video from the dashboard camera begins, the Ruiz vehicle, a black Ford 500, is traveling in the right lane of the two-lane freeway. (Pl.'s Ex. 1 at time code 15:56:50 (video).) Daugherty, several car lengths back and driving in the left lane, is gaining ground on the Ruiz vehicle. After approximately 15 seconds, Daugherty has caught up completely and begins traveling alongside the Ruiz vehicle. He drives next to the Ruiz vehicle for approximately 10 seconds, then drops back, pulls into the right lane, and activates his emergency lights, at which point the Ruiz vehicle pulls over to the side of the road.

The defendants offered Todd Hutchison, an accident reconstruction expert, as an expert witness. Hutchison opined that, from the beginning of the dashboard camera video to the time the Ruiz vehicle begins to slow down, the Ruiz vehicle was traveling at a constant speed of

---

[5] Daugherty testified that the dashboard camera is connected to a digital video recorder ("DVR") in his patrol car, which continuously and temporarily records the most recent 30 seconds of video, without audio. (Tr. 108.) When the patrol car's emergency lights are activated, the immediately preceding 30 seconds of video are permanently recorded, the car's microphone is activated, and both video and audio are permanently recorded from that point forward. (Tr. 108-09.) Daugherty testified that, although he had never done it, it is possible to manually turn on the DVR so that it permanently records video. (Tr. 107-08.)

approximately 69 mph or 70 mph.[6]  (Tr. II 24-25; Def.'s Ex. 4 at 2-3 (Hutchison's report).)  On

cross examination, the government did not challenge this conclusion.  Hutchison's conclusion

corroborates the testimony of defendant Luis Ruiz, who stated that, at all relevant times, he was

driving on cruise control at 69 mph.[7]  (Tr. 192.)  Luis testified that he did this because he was

illegally driving on a learner's permit and did not want to get stopped.  (Tr. 192.)

Notably, the testimony of Agent Childers offered no support for the assertion that the

Ruiz vehicle was ever speeding.  Childers stated that, as the Ruiz vehicle approached, he heard

the radar squelch, so he looked at the occupants of the vehicle.[8]  (Tr. 161.)  The squelch indicates

that a car has crossed the radar's beam; the faster a car goes, the higher-pitched the squelch.  (Tr.

182.)  Childers testified that he is not familiar enough with the radar unit to know, based on

pitch, if the Ruiz vehicle was speeding.  (Tr. 182.)  He also testified that he did not recall

visually judging the speed of the Ruiz vehicle.  (Tr. 172.)  Moreover, despite the fact that the

radar unit's readout is a large display in the middle of the patrol car's dashboard (*see* Pl.'s Ex.

---

[6] The two lanes of southbound I-65 are separated by a dashed white line, and the video
clearly shows the patrol car passing these white dashes.  Hutchison went to the relevant stretch
of I-65 and measured the length of ten dashes and the space between them.  (Def.'s Ex. 4 at 1.)
After calculating the average length, Hutchison was able to calculate the patrol car's speed based
on the time it took the car to pass the dashes in the video.  He concluded that, when the patrol car
was beside the Ruiz vehicle, the patrol car was traveling between 68.79 mph and 70.09 mph.
(*Id.* at 2.)

[7] Luis testified that, because he was going the speed limit of 70 mph, he was driving in
the left lane.  (Tr. 214.)  He stated that, although "some" cars passed him on the right, "usually
they didn't pass [him] because [he] was going the speed limit."  (Tr. 214-15.)

[8] Childers testified that, as the Ruiz vehicle passed, he was able to make out that two
males were in the front seats and that "something," which eventually turned out to be a pink
child's car seat, was in the back.  (Tr. 162.)

28), Childers testified that he never looked to see the speed listed on the readout (Tr. 162, 180-81).

Childers stated that, when the patrol car pulled out, he "didn't really make any assumption as to whether [the Ruiz vehicle] was speeding or not." (Tr. 172.) He further testified that he never looked at the patrol car's speedometer to see how fast it was going, either when they were catching up to the Ruiz vehicle or when they were beside it. (Tr. 164-65.) While they were pursuing the Ruiz vehicle, there was no discussion between Childers and Daugherty. (Tr. 176.) Childers testified that, once they pulled alongside, Daugherty merely "asked [him] what was in the back seat." (Tr. 176.) Childers testified that he reviewed neither the Report nor the Narrative prepared by Daugherty. He stated that this lack of review was "common," although "not necessarily . . . routine." (Tr. 168.)

By the time of the evidentiary hearing, six months after Daugherty had written his Report and Narrative, Daugherty had changed his story in several respects. First, and most important, he testified that the Narrative was incorrect in stating that he paced the speed of the Ruiz vehicle while beside it. Instead, Daugherty claimed that he actually paced the vehicle while following behind it:

> A. [Those sentences] should read, "I paced the vehicle for approximately ten seconds, *then* pulled up beside the vehicle, and then initiated my emergency equipment and I stopped at the 118 mile marker.
>
> Q. Okay.
>
> A. What had happened [as stated in the Narrative] is correct. It's just in the wrong sequence. . . .

> Whenever we pulled out of the 121 mile marker, we caught up to the vehicle, was approximately four car lengths behind it, maybe a little more, maybe a little less, and we stayed there. And we were driving about 77 miles an hour.
>
> [Then], he had slowed down, moved over to the right lane, I pulled up beside of the vehicle.[9] We looked over into it, and then I initiated the traffic stop.[10]

Q. So if you weren't pacing the vehicle when you were beside it, why pull up beside the vehicle at all?

A. We pulled up beside the vehicle to look into it.

_____

[9] Childers testified that, after catching up to the Ruiz vehicle, the patrol car "maintained an even distance for a short amount of time," which he estimated to be 10 or 15 seconds. (Tr. 163, 175.) He stated that, after that, the patrol car "pulled up next to it in an attempt to further ascertain what was in the back seat." (Tr. 163.)

Luis testified that he saw the patrol car at the side of the road as he initially passed it but that he did not see it pull out. (Tr. 193.) Luis stated that he eventually noticed the patrol car following his vehicle and that it followed him "for a period of time." (Tr. 193.) He stated that he pulled into the right lane, the patrol car pulled alongside, and then the patrol car dropped back and pulled him over. (Tr. 193.)

[10] Hutchison, the defendant's expert, testified that there were inconsistencies between the dashboard camera video and Daugherty's account of the pursuit. He pointed out that Daugherty testified (1) that the Ruiz vehicle was traveling between 77 and 79 mph, (2) that he pulled out three to four seconds after the Ruiz vehicle passed, and (3) that he accelerated up to a speed of more than 100 mph but less than 126 mph to catch up to the Ruiz vehicle. (Tr. II 28-32.) Hutchison calculated that, at a top speed of 100 mph, it would have taken Daugherty approximately 0.94 miles to catch up, and, at a top speed of 110 mph, it would have taken him approximately 0.80 miles. (Tr. II 32-33.) This conflicts with Daugherty's estimation that he caught up to the Ruiz vehicle in approximately one-half mile. Hutchison ultimately opined that, because the dashboard camera video starts 1.3 miles from the point where Daugherty pulled out, Daugherty could not possibly have caught up to the Ruiz vehicle, followed behind it, and paced it for ten seconds before the video started. (Tr. II 39, 43.)

The court rejects this conclusion. Even using Hutchison's own figures, the patrol car caught up to the Ruiz vehicle as much as one-half mile before the dashboard camera video begins. At 77 mph, the patrol car would have had more than enough time to pace the Ruiz vehicle for several seconds, slow down as the Ruiz vehicle slowed and changed lanes, and then accelerate to pull beside the Ruiz vehicle. Simply put, Daugherty's account of the pursuit is not mathematically impossible.

Q.      Why do you do that generally in your practice of drug
         interdiction? . . .

A.      Where I know all the factors prior to those lights being
         activated in case they run, we – shots are fired, something
         happens [–] I can at least give some kind of description of
         how many people are in it, what they are wearing, maybe
         some other threats that are in the vehicle.  There may be
         somebody laying down that I don't see, just a number of
         factors.  It all has to do with safety.

Q.      Is it common for you to pull beside a vehicle before you
         effectuate a traffic stop?

A.      Every time?  No.  A lot of times, yes.

(Tr. 76-77 (emphasis added).)

Daugherty testified that he would not have written a ticket based on his pacing maneuver,

because he was behind the Ruiz vehicle and was not looking at his speedometer.  (Tr. 124-25.)

He stated that he "merely put that in there to show that [Luis] didn't slow down to below 70.  I

mean, we were staying about 77, and it may have been 75 . . . ."  (Tr. 124.)  Daugherty testified

that the Ruiz vehicle then gradually slowed and changed lanes and that he did not remember

seeing the vehicle's brake lights.  (Tr. 125; *see also id.* 166 (Childers' testimony that he did not

recall ever seeing brake lights).)

Second, Daugherty testified that the mile marker designations listed in his Report and

Narrative were incorrect; he was actually sitting at mile marker 121, not mile marker 119, when

he was monitoring traffic.  (Tr. 71, 75; *see also* Tr. 158 (Childers' testimony that they were

sitting at mile marker 121).)  In fact, the dashboard camera video shows him passing mile marker

119 while pursuing the Ruiz vehicle.  (Tr. 84.)  Daugherty testified that he caught up to the Ruiz

vehicle "somewhere right around" mile 120.5, and he estimated that the dashboard video begins at mile 119.7.  (Tr. 83-84; *see also* Tr. 123 (stating that it took "at least a half a mile to catch the vehicle" and that he caught up around 120.5 or 120.35).)  Daugherty testified that the Ruiz vehicle pulled over near mile 118.9, not mile marker 118, as stated in the Narrative, or mile marker 113, as stated in the Report.  (*Id.* 72, 127, 139.)

Third, Daugherty testified that the Ruiz vehicle was traveling "by itself" when it passed by, and that, when he looked back to his right to ensure that he could pull out and give chase, there was one car that had moved from the left to the right lane "a pretty good distance" before approaching the patrol car.  (Tr. 121; *see also* Tr. 137 (testifying that the other car was "in the left lane a little [ways] behind [the Ruiz vehicle]"); Tr. 172 (Childers's testimony that he recalled "another vehicle further down the interstate behind the [Ruiz] vehicle"); Tr. 214 (Luis' testimony that his car "was the only car in the [left] lane.").)  Thus, Daugherty could "pull out immediately" after the Ruiz vehicle passed.  (Tr. 121; *see also* Tr. 173 (Childers' testimony that they did not need to wait for traffic before pulling out).)  This seems to conflict with the Report and Narrative, which both stated that Daugherty pulled out "[w]hen it was safe" and that the Ruiz vehicle "had put a considerable amount of distance between it and the *cars* it was originally traveling near."  (Pl.'s Ex. 21 at 1; Pl.'s Ex. 22 at 1 (emphasis added).)

Fourth, Daugherty testified that, when the Ruiz vehicle came into radar range, the radar unit read 79 mph, at which point he locked the speed.  (Tr. 117.)  Although the Report and Narrative both state that Daugherty saw the vehicle and then "turned on [his] radar," he testified that "there's absolutely no doubt in [his] mind" that the radar unit was already turned on as the

Ruiz vehicle approached.  (Tr. 118; *see also* Tr. 171 (Childers' testimony that he did not know whether Daugherty turned the radar on before or after the Ruiz vehicle came into sight).) Daugherty stated that, usually, the only time he would turn his radar unit off is if he were "hiding in the median or in the suburban city, country, or something like that."  (Tr. 118.)

At the hearing, Daugherty testified that he did not spend much time reviewing and revising the Report and that he "had a lot on [his] mind" when he drafted it, because he was performing tasks related to the upcoming Tennessee Narcotics Officers Association conference.[11] (Tr. 68, 72.)  Daugherty stated that he "cannot explain" the "several mistakes" contained in the Report and Narrative, that he "do[es] not have a good excuse for it," and that he was "not going to try to cover it up."  (Tr. 118-19.)  Daugherty testified that, as he wrote the documents, he knew that the information contained therein would be used to obtain arrest warrants for the defendants and used later in court.  (Tr. 120, 136.)

## II.     The Stop and Search

Once the Ruiz vehicle pulled over to the side of the road, Daugherty approached the driver's side of the car.  Childers remained in the patrol car, a decision that Childers testified was not prearranged.  (Tr. 177.)  Daugherty asked Luis to step out of the car and proceeded to interview him in front of the patrol car.

Daugherty never explicitly stated that the Ruiz vehicle was speeding.  Instead, he told

---

[11] Daugherty testified that the conference "was taking place" when he drafted the Report (Tr. 68), although in a later-filed affidavit he clarified that the conference actually took place the next week and that, on September 15, 2010, he was preparing several presentations that he planned to give at the conference (Docket No. 101, Ex. 2 ¶¶ 6-8).

Luis, "All right, you need to slow down. You're almost to Nashville. The speed limit is 70. Okay?" (Ex. 1 at time code 16:00:38-51.) In response, Luis shrugged, smiled, and stated, "I was like, I was like – almost there, man." (*Id.*)

After asking Luis questions regarding his trip, his destination, and who owned the car, Daugherty approached the passenger's side and asked similar questions of Gerardo. Because Gerardo's answers conflicted with Luis', and because Daugherty believed that Luis' demeanor was fidgety and nervous, Daugherty requested permission to search the vehicle. Daugherty presented a form explaining, in English and Spanish, that the signer was granting permission to search and was free to refuse permission. Both Luis and Gerardo signed the form. (Pl.'s Ex. 19.)

A third officer, Luis Zapata, arrived, and the officers searched the vehicle. Ultimately, they found a package containing 536 grams of heroin hidden in the body of the car. Luis and Gerardo were arrested, read their Miranda rights, and placed in the back seat of the patrol car.

While the defendants were in the patrol car, the car's microphone recorded them speaking to each other in Spanish. Part of their conversation, as transcribed and translated by the government, was:

> Gerardo: Oh, fuck.
>
> Luis: What, man?
>
> G: [Ya estamos bien retrasados, buey.]
>
> L: What's that?
>
> G: Heroin.

L:      Heroin?

G:      Well, yeah.

L:      Wasn't it (unintelligible)?

G.      No.

(Pl.'s Ex. 1a at 2-3.)

The government's translation of Gerardo's statement, "Ya estamos bien retrasados, buey," was "We're really late now, man." (*Id.* at 3.) Luis, however, testified that Gerardo was using the word "retrasado" to mean "really retarded, like dumb," not "late." (Tr. 191.) According to Luis, "[Gerardo] was like oh, fuck; [Luis] was like, what man; [Gerardo] was like, well, we're really retarded." (Tr. 191.) Luis claimed that they were discussing Luis' decision to drive without a license, not the drugs hidden in the car. (Tr. 191, 198.) He testified that, when Gerardo made that statement, Luis was unaware that there were drugs in the car and that the officers had not yet placed the heroin on the hood of the patrol car. (Tr. 191-92, 200.)

The defendants were eventually indicted on counts of conspiracy to distribute and to possess with intent to distribute heroin.

## III.    Pre-Hearing Events

Daugherty testified that the first time he viewed the dashboard camera video was at the end of January or early February 2011. (Tr. 81.) On February 2, 2011, Daugherty called the U.S. Attorney's Office to have a pretrial meeting concerning the mistakes in his Report and Narrative regarding the pacing maneuver and the mile markers. (Tr. 79.) Before meeting with the government's lawyers, Daugherty prepared by reviewing the video, reports, and photos

related to the case.  (Tr. 82.)  He also traveled along the relevant portion of I-65 to review the proper mile markers.  (Tr. 83.)

Daugherty further testified that, on February 28, 2011, he heard rumors from an assistant district attorney that defense counsel was planning to call an expert to discredit his testimony. (Tr. 84-84.)  Previously, in October 2010, defense counsel had sent Daugherty a number of questions regarding his patrol car's speedometer and radar unit.  (*See* Pl.'s Ex. 23.)  Daugherty understood that the defense expert's testimony "was basically . . . going to be an attack on [him]."  (Tr. 84.)  Daugherty testified that, by the time he learned of the potential expert testimony, he had already realized the mistakes in his Report and Narrative.  (Tr. 85.)  The government elicited testimony from Daugherty that he knew that lying on the stand would have dire consequences, including the loss of his job.  (Tr. 150-52.)  He testified that he had experienced "sleepless nights before this hearing."  (Tr. 150.)

Childers testified that he first discussed the events of the stop with Daugherty the week before the evidentiary hearing.  (Tr. 169-70.)  Childers stated that he knew that Daugherty "was nervous" about the evidentiary hearing and that he had never seen Daugherty so nervous about a defense motion before.  (Tr. 178.)

## ANALYSIS

### I.  Fourth Amendment Standard

"Stopping a vehicle and detaining its occupants amounts to a seizure under the Fourth Amendment."  *United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000).  Although a police officer generally must obtain a warrant before making a seizure, "'so long as the officer has

probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful.'" *Id.* (quoting *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993)); *see also United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) ("A police officer legally may stop a car when he has probable cause to believe that a civil traffic violation has occurred."). This is true "regardless of the officer's subjective motivation for the stop." *United States v. Burton*, 334 F.3d 514, 516 (6th Cir. 2003) (citing *Whren v. United States*, 517 U.S. 806, 812-13 (1996)). If the officer lacks probable cause regarding a traffic violation, however, "the evidence found in the subsequent search must be suppressed."[12] *Freeman*, 209 F.3d at 466.

"Probable cause is a reasonable ground for belief supported by less than prima facie proof but more than mere suspicion." *Blair*, 524 F.3d at 748. This standard is satisfied "where the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *United States v. Davis*, 430 F.3d 345, 352 (6th Cir. 2005). The government bears the burden of showing, by a preponderance of the

---

[12] There is some confusion regarding whether Sixth Circuit case law requires mere "reasonable suspicion" of a traffic violation, rather than probable cause, to justify a traffic stop. *United States v. Hughes*, 606 F.3d 311, 316 n.8 (6th Cir. 2010); *Blair*, 524 F.3d at 748 n.2; *United States v. Sanford*, 476 F.3d 391, 394-95 (6th Cir. 2007); *Gaddis v. Redford Twp.*, 364 F.3d 763, 771 n.6 (6th Cir. 2004) (noting conflicting cases). This confusion has resulted because the Sixth Circuit "has developed two separate tests to determine the constitutional validity of vehicle stops: an officer must have probable cause to make a stop for a civil infraction, and reasonable suspicion of an ongoing crime to make a stop for a criminal violation." *Blair*, 524 F.3d at 748; *see also United States v. Simpson*, 520 F.3d 531, 541 (6th Cir. 2008) (stating that "reasonable suspicion of an ongoing misdemeanor is adequate justification" for a stop).

Regardless, in this case, the distinction between the two standards is academic. Daugherty had either reasonable suspicion or probable cause to believe that the defendants were speeding if, and only if, he actually observed them speeding.

evidence, that probable cause for the traffic stop existed. *United States v. Beal*, 810 F.2d 574, 577 (6th Cir. 1987) (stating that the "government . . . has the burden of proving the propriety of a warrantless seizure"); *United States v. Bradley*, 163 Fed. Appx. 353, 357 (6th Cir. 2005) ("'[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.'" (quoting *United States v. Matlock*, 415 U.S. 164, 177 n. 14 (1974)); *see also United States v. Moses*, 289 F.3d 847, 852 (6th Cir. 2002) (defining the "preponderance of the evidence" standard as requiring a showing that the assertion at issue "more likely than not" is true).

## II.     Whether the Government has Met its Burden

This case boils down to whether Daugherty saw the Ruiz vehicle speeding. If so, the traffic stop was legitimate. If not, the stop was illegal, and any resulting evidence must be suppressed.[13]

The court concludes that the government has not met its burden of showing, by a preponderance of the evidence, that Daugherty observed the defendants speeding. The only evidence that the Ruiz vehicle was traveling 79 mph is Daugherty's own testimony. The court finds, however, that Daugherty's account is not credible, in light of all of the evidence before the court.

---

[13] In their Motions to Suppress, both defendants also argue that Daugherty detained the defendants for an unreasonably long time before obtaining consent to search the car. (Docket No. 43 at 7-9; Docket No. 54 at 4-6.) Gerardo further argues that the consent obtained by Daugherty was invalid. (Docket No. 54 at 6-7.) Because the court concludes that the government has not met its burden of showing probable cause for the stop, it is unnecessary to address these additional arguments.

First, Daugherty's credibility suffered because his account of the traffic stop at the evidentiary hearing differed, in a key respect, from the account contained in the Narrative, which he drafted two days after the traffic stop.  The Narrative clearly stated that Daugherty paced the Ruiz vehicle at 77 mph for ten seconds while traveling beside it.  This is consistent with the dashboard camera video, which shows the patrol car accelerating and traveling beside the Ruiz vehicle for approximately ten seconds.

Of course, the expert testimony proffered by the defendants undisputedly demonstrated that the Ruiz vehicle was traveling 70 mph, not 77 mph, during those ten seconds.  Thus, Daugherty testified at the suppression hearing that the Narrative was mistaken and that he actually paced the vehicle from behind before pulling beside it for other reasons.  But it seems unlikely that Daugherty made such a significant error in a report written just two days after the stop, particularly because that account is consistent with the only available documentary evidence of the pursuit.  It seems more likely that Daugherty really *did* pace the car while he was beside it, as written in the Narrative, and that he only later realized that the video showed that the Ruiz vehicle was not speeding.[14]  Although Childers' and Luis' testimony confirms that the patrol car followed behind the Ruiz vehicle for at least several seconds before pulling alongside,

---

[14] The video of the patrol car pulling beside the Ruiz vehicle is part of the 30-second segment that was permanently recorded because the patrol car's emergency lights were subsequently activated.  Significantly, when Daugherty wrote the Narrative, he did not necessarily know that this portion of the video had been permanently recorded.  He did not view the video until February 2011, and he testified that, "[b]efore this hearing[,] . . . [he] didn't even know exactly how far [the DVR] backed up recorded [sic]."  (Tr. 109.)  He also testified that the 19th Judicial District Drug Task Force purchased and installed his dashboard camera and that he had "no idea what the capabilities were."  (Tr. 105.)

their testimony does not corroborate the assertion that Daugherty was pacing the vehicle at that time.  The discrepancy regarding the pacing maneuver between Daugherty's testimony and his earlier-written Narrative is striking.[15]

Second, Daugherty's credibility suffered because Childers, who was in the patrol car at all relevant times, steadfastly refused to corroborate Daugherty's testimony that the Ruiz vehicle was speeding.  Remarkably, Childers did not remember visually estimating the speed of the Ruiz vehicle, even though he specifically looked at the car once he heard the radar squelch.  Remarkably, Childers did not see the radar readout, even though the readout sits in the middle of the patrol car dashboard, easily visible from the passenger seat, and the locked speed remains visible for some time.  Remarkably, neither Childers nor Daugherty mentioned the alleged speeding while they were pursuing the Ruiz vehicle.  Childers even refused to state that he "assumed" that the Ruiz vehicle was speeding as they began pursuit, instead testifying that he "didn't really make any assumption as to whether [it] was speeding or not."  (Tr. 172.)  It is clear that, throughout his testimony, Childers consciously and deliberately avoided stating that the Ruiz vehicle was speeding.  A reasonable explanation for this is that the vehicle was not speeding.  Although Childers did corroborate other details of Daugherty's testimony, he offered no support for the government's primary contention that Daugherty observed the defendants speeding.

---

[15] Less striking are the numerous other discrepancies between Daugherty's testimony and the Report and Narrative, such as the erroneous mile marker designations.  Nevertheless, although these mistakes do not have a large impact on the truthfulness of Daugherty's testimony, they do show that his work on this case was sloppy and inaccurate.

Third, Daugherty's credibility suffered from his demeanor on the stand. He appeared emotional and nervous at times and admitted to suffering "sleepless nights" in anticipation of the hearing.[16] Overall, his demeanor and testimony gave the impression that he had an unusually large personal stake in the hearing.[17] But Daugherty has been a police officer since 1996 and on a full-time drug interdiction assignment since 2002 (Tr. 9); he has undoubtedly testified in court many times before. In the court's experience, it is unusual for an experienced officer who is testifying truthfully to have such a strong reaction to a routine defense motion, even if the defense has retained an expert witness.

In light of these major weaknesses in Daugherty's testimony, the court cannot conclude that it is more likely than not that he observed the Ruiz vehicle speeding.[18] In fact, it makes sense that Luis would drive at or just below the speed limit. At best, he was driving without a valid license; at worst, he knew he was transporting heroin. Either way, Luis had a strong motive to travel the speed limit to avoid drawing attention to himself.[19] Accordingly, the court finds that the government has not shown, by a preponderance of the evidence, that Daugherty

---

[16] Childers testified that this apprehension concerning a suppression hearing was uncharacteristic for Daugherty.

[17] Daugherty characterized the defense case as "an attack on [him]." (Tr. 84.)

[18] This is not to say that Daugherty necessarily intentionally misstated the truth. But the serious questions concerning the accuracy of his testimony logically lead to the conclusion reached herein.

[19] Luis testified that his car was on cruise control. The court is inclined to believe this, even though Luis' testimony on most other topics was not credible. For example, his story regarding why the defendants were traveling to Nashville was vague and seemed to change upon cross-examination. (*See* Tr. 200-05.) It is likely that the less credible portions of Luis' testimony were an attempt to avoid admitting that he knew he was transporting drugs.

had probable cause (or reasonable suspicion) to believe that a traffic violation had occurred. Consequently, the ensuing traffic stop was illegal, and the evidence resulting from the stop must be suppressed. *See, e.g.*, *United States v. Alix*, 630 F. Supp. 2d 145, 153 (D. Mass. 2009) (finding that an officer's testimony regarding a speeding violation was not credible and concluding that no violation occurred); *United States v. Harvey*, No. 2:10CR42PPS, 2010 U.S. Dist. LEXIS 83052, at *14-16 (N.D. Ind. Aug. 13, 2010) (finding that an officer's testimony lacked credibility and concluding that the government had not met its burden of showing probable cause for a traffic stop); *United States v. Murphy*, 402 F. Supp. 2d 561, 570 (W.D. Pa. 2005) (same); *United States v. Gant*, 412 F. Supp. 2d 451, 456 (E.D. Pa. 2005) (considering numerous inconsistencies in two officers' testimony and concluding that no probable cause existed for a traffic stop).

The government points out that, while the defendants were in the back seat of the patrol car, Gerardo lamented that they were "really late," and it argues that this makes it likely that they were speeding.[20] (Docket No. 101 at 10-12.) First, this is unpersuasive, because Gerardo made the statement 25 minutes after they had been pulled over; thus, the statement does not necessarily imply that they were late *before* the stop. Second, Luis testified that Gerardo's statement – "Ya estamos bien retrasados" – actually meant "now we're really retarded," not "now we're really

---

[20] The government has filed a Motion to Strike, seeking to strike certain supplementary material attached to Luis' reply memorandum, certain overheated rhetoric contained in that memorandum, and certain law review citations contained in Gerardo's reply memorandum. (Docket No. 113 at 1-6.) None of the material that the government seeks to exclude is necessary to the court's resolution of this matter, and the court has disregarded the material. Accordingly, the government's Motion to Strike will be denied.

late."  Notably, the Merriam-Webster online Spanish-English dictionary lists "retarded, mentally slow" as the first definition of "retrasado," which is consistent with Luis' translation of the phrase.[21]  Merriam-Webster Dictionary, http://www.merriam-webster.com/spanish/retrasado (last visited on June 3, 2011).  In addition, Luis' translation makes sense in the context of the conversation.  By the time Gerardo made the statement, the officers had already discovered the contraband (after the defendants freely gave consent to search), and the defendants had been arrested.  It is more likely that, at that point, Gerardo would remark on their stupidity rather than their lateness.

Next, the government argues that Luis acknowledged that he was speeding by responding to Daugherty's statements "you need to slow down" and "you're almost to Nashville" by saying "I was like . . . almost there, man."  (Docket No. 101 at 6-10.)  But this statement in no way can be characterized as an admission of speeding.  Instead, it seems to be a statement of regret that the defendants had almost, but not quite, succeeded in reaching their destination.  It could also be understood as an attempt to placate the officer, in the hope that he would let the defendants go with a warning.  Daugherty's phrasing implied that he was considering letting the defendants continue their trip; it is unsurprising, then, that Luis would do everything possible to not antagonize him, particularly given that Luis was driving without a valid license and perhaps knowingly transporting heroin.  The exchange is not a clear admission of guilt that Luis was speeding, as urged by the government.

---

[21] The court takes judicial notice of this definition.  *Comerica Bank v. Lexington Ins. Co.*, 3 F.3d 939, 944 (6th Cir. 1993) ("[T]he district court was within its discretion to take judicial notice of the dictionary definition of [a word].").

The government also argues that Daugherty simply had no reason to stop the defendants without probable cause and subsequently lie about it. The court finds it sufficient to note the obvious fact that, ultimately, drug interdiction officers advance their careers by finding drugs and making arrests.[22] It is not beyond the realm of possibility that, as argued by the defense, a drug interdiction officer might racially profile two Hispanics traveling on the freeway in a car with out-of-state license plates.[23] Nor is the court persuaded by the government's argument that Daugherty had an overwhelming incentive to not lie on the stand because he would be forced out of law enforcement if caught. First, it is not a foregone conclusion that any discipline of Daugherty will flow from this ruling. Second, it logically flows from this argument that the court must always believe the testimony of law enforcement officers over other witnesses, which would be an abdication of the court's responsibility to make fair credibility determinations.

Finally, the court feels compelled to highlight the fact that the central issue in this case – whether the Ruiz vehicle was speeding – would likely not be in dispute if Daugherty and the 17th Judicial District Drug and Violent Crime Task Force had simply used the technology at

---

[22] At the hearing, Daugherty testified that an arrest for one-half kilogram of heroin would not "materially advance" his career. (Tr. 152.) Of course, when he initiated the traffic stop, Daugherty did not know that the car would contain only one-half kilogram of drugs. It also is obvious that, once an arrest has been made, an officer has an incentive to not allow key evidence to be suppressed.

[23] The government argues that there is no evidence that Daugherty ever perceived the defendants' race before pulling them over. (Docket No. 101 at 52-53.) But both officers testified that they looked at the occupants of the Ruiz vehicle as it initially passed; Daugherty could see that the driver was a male whose arms were stiffly locked at a 10-and-2 position (Tr. 23, 91), and Childers could see that both occupants were male (Tr. 162). It is likely that, if the officers could see these details, they could also see that both occupants were Hispanic. Moreover, the officers undoubtedly could confirm the occupants' race when they pulled up next to the vehicle, supposedly to see what was in the back seat.

their disposal to create documentary evidence of the defendants' alleged traffic violation.  It

appears that Daugherty's radar unit can interface with the dashboard camera, so that a permanent

record of the radar data is preserved.[24]  Such evidence would have definitively resolved the

question of whether the Ruiz vehicle was clocked at 79 mph.  Moreover, Daugherty's patrol car

is equipped with a DVR that continually stores, on an ongoing basis, the most recent 30 seconds

of video from the dashboard camera; once the car's emergency lights are activated, the

immediately preceding 30 seconds are recorded permanently.  But it is entirely foreseeable that

30 seconds might not be enough to capture all relevant footage.  If the DVR were simply set up

to permanently record the preceding 2 minutes of feed, rather than the preceding 30 seconds, the

entire pursuit of the Ruiz vehicle would have been recorded.  This is, no doubt, technologically

possible, and such video would have confirmed or controverted Daugherty's testimony.

    The failure to employ such simple technological means is particularly egregious here,

given that Daugherty is a drug interdiction officer.  Essentially, all of Daugherty's traffic stops

are pretextual attempts to find illegal drugs.  If a stop is successful at finding drugs, it is likely

that the defendant will challenge the basis for the stop.  (*See* Tr. 145 ("Q.  You knew that

whether the vehicle was speeding was going to be the subject of the debate?  A.  Absolutely.

That – *in any interdiction case*, it starts with the traffic stop.  That's where the case starts."

(emphasis added)).)  It is difficult to imagine a legitimate reason for not making all reasonable

---

[24] Daugherty testified that he knew it was possible to interface his radar unit with his dashboard camera, although he had never done so.  (Tr. 104.)  In fact, the dashboard video contains a box with three figures, "T: 000, P:000, L:000," which defense counsel suggested represent "target vehicle," "patrol vehicle," and "lock."  (Tr. 104.)

efforts to create objective, documentary evidence of a defendant's initial traffic violation.

As it is, however, the only evidence that the Ruiz vehicle was speeding was Daugherty's testimony, which the court finds to be not credible. Accordingly, the court cannot find, by a preponderance of the evidence, that Daugherty actually observed the defendants speeding.

## CONCLUSION

For the reasons stated herein, the defendants' Motions to Suppress will be granted, and the government's Motion to Strike will be denied.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge